UNITED STATES OF AMERICA
DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

W.L., by his next friend ROBERT
LEMSON; and ROBERT LEMSON,

          Plaintiffs                         Case No.

v                                    Hon.
                                       Magistrate Judge

NEWAYGO PUBLIC SCHOOLS, and
BEN GILPIN, JAMES SMITH, KYLE
McALISTER, VINCE GRODUS, SHELLEY
HANCE, TRICIA CRATER, and
ALLISON HUG, in their individual
and official capacities,

          Defendants

Attorneys for Plaintiffs:
Nicholas Roumel (P37056)
ROUMEL LAW
4101 Thornoaks Dr.
Ann Arbor MI 48104
734-645-7507
*nick@roumel-law.com*

## COMPLAINT AND JURY DEMAND

Plaintiffs file their complaint as follows:

### Preliminary Statement

"WL" is a disabled fifth-grade middle school student at Newaygo Public Schools who has been the victim of multiple assaults from peers. Defendants failed to enforce a safety plan specifically crafted to keep WL away from these peers, resulting an another more serious assault which resulted in WL's emergency surgery and hospitalization, and failed to enforce consequences for those who assaulted WL.

When WL's father, Plaintiff Robert Lemson, spoke out against bullying and the Defendants' failure to protect his disabled son, Defendants retaliated by barring him from speaking at school board meetings, implementing a trespass ban against Mr. Lemson, and even calling the police when he assisted in the rescue of stray cows belonging to one of the Defendants.

WL and his father bring this suit against Defendants, seeking damages for the injuries to WL as well as the emotional and other damages for the deprivation of their civil rights and civil liberties.

### Parties/Jurisdiction/Venue

1.      Plaintiff WL resides in Newaygo County Michigan, and at all times relevant, was a student at Newaygo Public Schools, in the middle school. He is a minor born in 2012 and in the 2023-2024 school year, relevant to these claims, he was in sixth grade.

2.      This suit is brought by his father Robert Lemson as next friend, and Mr. Lemson is also a Plaintiff.

3.      Defendant Newaygo Public Schools ("Newaygo" or "the District") is a Michigan public school district pursuant to the School Code of 1976, MCL 380.1 et seq., with principal offices at 360 S. Mill St., P.O. Box 820, Newago, Michigan, 49337.

4.      Defendant Ben Gilpin was the superintendent of schools for Newaygo and had ultimate responsibility for supervision, training, and implementation of policies in the district.

5.      Defendant James Smith was, at all times relevant, the principal of the Newaygo Middle School had ultimate responsibility for supervision, training, and implementation of district policies at the middle school, and for the safety of students in his care.

6. Defendant Kyle McAlister was, at all times relevant, the assistant principal of the Newaygo Middle School had significant responsibility for supervision, training, and implementation of district policies at the middle school, and for the safety of students in his care.

7. Defendant Vince Grodus was the President of the Newaygo School Board and had ultimate responsibility for public commentary at school board meetings.

8. Defendant Allison Hug was the behavioral therapist for WL.

9. Defendant Shelley Hance was a behavioral interventionist for WL.

10. Defendant Tricia Crater was the counselor at Newaygo Middle School.

11. The events that are the basis for this lawsuit took place in Newaygo, Newaygo County, Michigan.

12. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1331, 1343 (a)(3), 1343(a)(4), 2201 and 2202; 42 U.S.C. §1983, Section 504 of the Rehabilitation Act of 1973 [29 U.S.C. §794(a), Title II of the Americans With Disabilities Act [42 U.S.C. § 12131 *et seq.*], the Michigan Persons with Disability Civil Rights Act [MCL §37.1101, et seq.; MPWDCRA], and Michigan common law.

**WL is Victimized by Multiple Assaults**

13. WL is a student with a disability, Autism Spectrum Disorder and PTSD, and is eligible for special education services pursuant to Section 504 of the Rehabilitation Act of 1973.

14. WL has had multiple problems being bullied by several students, including "CC," "SM," "AS," "JG," and "VM."

15. On September 19, 2023, WL was assaulted by JG, who was an eighth-grade student, in the bathroom at the Newaygo Middle School. JG assaulted WL with such force that he knocked WL's jaw out of alignment.

16.     JG did not receive any meaningful consequence for this assault, despite state law and district policies permitting serious discipline for students who assault school employees and others. On information and belief, he was suspended from school for just one day.

17.     After this assault, in a meeting held on September 21, 2023 to update WL's special education plan, the meeting agenda noted "consideration for class placement away from peers with history of behavior challenges with WL for the purpose of limiting interpersonal conflicts with peers…. CC, SM, AS (per parent), Mrs. Crater added VM."[1] The "persons responsible" for this accommodation included Mrs. Hance, Administration, and Mrs. Crater.

18.     Defendants were on full notice of the danger WL faced from these peers, and accordingly updated WL's special education plan to include a safety plan to protect WL from physical harm.

19.     However, with no apparent justification, Defendants failed to follow the safety plan, and did not monitor the students documented to present a risk of harm to WL.

20.     As a result, these students, including CC, were unsupervised at recess and permitted to have unfettered access to WL.

21.     Because of his disability, WL does not have the necessary coping skills for self-policing, and as a special education fifth grade student, he is dependent on the adults who promised to protect him with this safety plan.

22.     On October 25, 2023, WL was again assaulted by the same student, CC, who forced him to swallow magnets on the school playground at recess.

23.     WL underwent emergency stomach surgery to remove the magnets; he has a permanent scar.

---

[1] "JG," who had knocked WL's jaw out of alignment, was not included in the plan because they were in different schools.

24.     He was excused from school from October 25 through November 6, 2023, and released with the following restrictions: to not ingest any non-food items and not to engage in activities or sports that caused abdominal pain over the incision.

**Defendants Retaliate Against WL and Robert**

25.     On January 24, 2024, a student on the safety plan, "AS," threatened to kill WL.

26.     Robert went to the school board meeting on February 5, 2024 to speak out against bullying in general, and as against his son.

27.     While he was speaking, the school board president, Defendant Vince Grodus, tried to silence him and throw him out of the meeting, and when Robert told him he had a First Amendment right to speak, the president told him "Not at the school board."

28.     On February 9, 2024, Defendant Smith informed Robert that WL had allegedly threatened a student the day before, and was suspended from school and extra-curricular activities at the district (such as participation in his recreational basketball league which practiced and played games at the district) until the investigation was complete.

29.     After Mr. Lemson went to the middle school offices concerning his son's suspension, Defendant Smith informed him that he was prohibited from entering the middle school during office hours "due to your disorderly and hostile behavior in the office" that afternoon.

30.     Mr. Lemson absolutely denies the allegations, or otherwise engaging in any disruptive behavior. He merely went with his wife to pick up WL's medication, said nothing significant, and left.

31.     On February 12, 2024, Defendants Smith and McAlister called Mr. Lemson to inform him that WL could no longer play basketball and that it was their decision.

- 5 -

32.     They also told Mr. Lemson that he and his wife Felicia could no longer be boosters for the basketball team.

33.     On February 13, 2024, there was an investigative meeting concerning the alleged threat that WL had made against another student. WL denied any threatening activity.

34.     After the investigation determined the truth that the allegation was baseless, Defendants returned WL to school effective February 20, 2024 but subject to intrusive searches of his belongings and with a metal detecting wand, along with random locker checks.

35.     The intrusive search protocol deprives WL of having adequate time for breakfast at school. Mr. Lemson appealed this but it was denied.

36.     On March 6, 2024, Defendant Gilpin sent Mr. Lemson a letter informing him that if he came to the middle school during office hours without prior permission, he would "be considered a trespasser and Law Enforcement officials will be contacted to remove you from school property" and that criminal charges may be filed against him.

37.     On Wednesday, March 13, 2024, Mr. Lemson and his wife were driving by the home of Defendant Allison Hug, WL's behavioral therapist. Ms. Hug lives on a farm, and Mr. and Mrs. Lemson noticed her cows were loose. They called the district to let them know as well as state troopers, and they helped contain the cows until the troopers arrived, helping to load them into Ms. Hug's trailer.

38.     Shortly after this, they received a call from another state trooper to notify them that they were trespassers and that if they returned to Ms. Hug's property they would be arrested.

39.     On information and belief, students who made threats to harm or kill WL were treated far more leniently for their alleged offenses than was WL for the same allegations, including but not limited to JG, CC, and AS for the incidents described above.

## Legal Allegations

_Count I – 42 USC § 1983 – State Created Danger (Hance, Crater, Gilpin, Smith, McAlister as to Plaintiff WL)_

40.     Plaintiff WL had a clearly established constitutional right to be free from danger created by these individual Defendants (Hance, Crater, Gilpin, Smith, and McAlister), or made more likely by these Defendants.

41.     At all times relevant, the individual Defendants were acting under color of state law.

42.     These Defendants acted in such a way as to create, or make more likely, a state created danger by knowingly and substantially increasing the risk of harm to WL from CC's and other peers' acts of violence.

43.     These Defendants were all well aware of CC's and other peers' history of uncontrolled violence and that they had posed a danger to WL.

44.     Despite this, even just weeks after CC assaulted WL in the bathroom, he was not given any meaningful consequence, and Defendants turned a blind eye to the safety plan specifically crafted to protect WL from harm, in complete and reckless disregard for the rights and safety of WL, and with deliberate indifference.

45.     The safety plan aspect of WL's special education individualized accommodation plan was the responsibility of Defendants Hance, Crater, and "Administration."

46.     Defendants Smith and McAlister were the principal, and assistant principal respectively, of Newaygo Middle School, and as such were the responsible school administration.

47.     Defendant Gilpin was the superintendent of schools for Newaygo and had ultimate responsibility for supervision, training, and implementation of policies in the district, including WL's special education and safety plans, and actively participated in the decisions described above.

48.     These Defendants actively participated in the decisions to disregard the safety plan, and all acted in concert, permitting CC and his peers free access to the outdoors and indoors of Newaygo Middle School, knowing full well that it was inevitable there would be further violence against WL.

49.     These Defendants were aware of CC's history of violence, and actively decided to disregard the District's disciplinary policies and state law, to not meaningfully discipline CC, and permitted him free access to the outdoors and indoors of Newaygo Middle School, knowing full well that it was inevitable he would commit another act of violence.

50.     These decisions and affirmative acts by Defendants resulted in WL being less safe and actively exposed to danger of assault by CC and other peers who posed a danger to WL.

51.     Under these circumstances, Defendants are not entitled to qualified or other governmental immunity.

52.     Defendants' deprivation of WL's constitutional rights damaged him as described herein and below.

### *Count II – 42 USC § 1983 – Supervisory Liability (defendants Gilpin, Smith, and McAlister as to Plaintiff WL)*

53.     WL had a constitutional right to liberty, including the right to personal security and bodily integrity and the right to be free from fear and harm at his school, and the right to be free from retaliation for asserting his rights to be safe at school.

54.     Defendants Gilpin, Smith, and McAlister deprived WL of his constitutional rights as outlined above, by failing to take adequate measures to protect him at school, jeopardizing his personal security and bodily integrity.

55.     These Defendants further deprived WL of his constitutional rights, by accusing him of threatening behavior, investigating him without justification, and subjecting him to intrusive searches that ostracized him and disrupted his school day.

56.     At all times relevant, these Defendants were acting under color of state law, using the power of their office, and alternately disregarding Newaygo policies, state law, and federal law, damaging WL as described herein and below.

57.     The unconstitutional actions of these Defendants included, but were not limited to:

    a.     Defendants' failure to adequately train, and maintain policies, handbooks and practices regarding appropriate policies and procedures for addressing physical abuse, including staff awareness, prevention and response.

    b.     Defendants' historical failure to adequately investigate and otherwise respond to reports of assault.

    c.     Defendants' failure to adequately train, remediate, maintain appropriate oversight to prevent future assault by persons (such as CC) known to have committed such harassment and assault.

    d.     Defendants' failure to enact and enforce policies to prevent their overt and tacit approval of STUDENT's actions, by not providing any meaningful sanctions or discipline, and removing the minimal safeguards that were in place before Plaintiff was assaulted by CC on the playground.

e.       Defendants' failure to adequately train, and maintain policies, handbooks and practices concerning discipline of students who pose an imminent danger of physical harm to others.

f.       Defendants' failure to adequately train, and maintain policies, handbooks and practices that facilitate reporting of student assaults, and to make reports without fear of retaliation.

g.       Defendants' failure to adequately train, and maintain policies, handbooks and practices regarding internal reporting of assault, and conduct of internal investigations.

h.       Defendants' failure to adequately train, and maintain policies, handbooks and practices regarding communications with employees and students concerning prevention, reporting, investigation, and resolution of assault allegations.

i.       Defendants' failure to adequately train, and maintain policies, handbooks and practices to assure the safety of the student population in light of known assault, and to prevent the recurrence of such events.

58.    Defendants' callous disregard of plaintiff's safety and rights rises to the level of deliberate indifference.

59.    Defendants are not entitled to qualified or other governmental immunity under this theory inasmuch as Defendants acted intentionally or grossly negligently, in a manner that was deliberately indifferent to the rights of Plaintiff, and as a result of custom or policy resulting in the deprivation of Plaintiff's constitutional rights to be free from assault and at risk of harm.

60.    Defendants' actions and omissions deprived Plaintiff of his constitutional right to be free from physical assault, and damaged him as described herein and below.

- 10 -

*Count III – 42 USC § 1983 - MONELL Liability – Defendant Newaygo School District (as to both Plaintiffs)*

61.     Defendant Newaygo Public Schools failed adequately to train, discipline, and supervise all individual Defendants, promulgating and maintaining de facto unconstitutional customs, policies, or practices rendering them liable for the constitutional violations alleged herein under *Monell v. Dept. of Social Services of the City of New York*, 436 U.S. 658 (1978).

62.     Defendant Newaygo knew or should have known that the policies, procedures, training, supervision, and discipline of all individual Defendants, were inadequate to prevent the risk of harm to students from assault such as that promulgated against WL by CC, and retaliation against those who experience it, report it, and speak out against it, such as WL and his father, Plaintiff Robert Lemson.

63.     Defendant Newaygo failed to establish, implement, or execute adequate policies, procedures, rules and regulations to ensure that their actions did not create or increase the risk Plaintiffs would be exposed to acts of violence and/or retaliation.

64.     Defendant Newaygo failed to establish, implement, or execute adequate policies, procedures, rules and regulations to ensure that their teachers, counselors and staff do not take actions that create or increase the risk of harm to students at Newaygo Middle School, including Plaintiff WL.

65.     Defendant Newaygo was on notice or should have known, of a history, custom, propensity, and pattern for the individual Defendants, and other employees of the District and Newaygo Middle School, to fail to properly identify a student with violent tendencies and act in such a way that created a risk of harm to students and/or increased a risk of harm to such persons, including Plaintiff WL.

66.     Defendant Newaygo explicitly and implicitly authorized, approved, or knowingly acquiesced in the deliberate indifference to the strong likelihood that constitutional violations, such as in the instant case, would occur, and pursued policies, practices, and customs that were a direct and proximate cause of the deprivations of Plaintiffs' constitutional rights, including the injuries to WL and the retaliation against him and his father, Robert Lemson.

67.     Defendant Newaygo knew that its policies, procedures, customs, propensity and patterns of supervising a student with violent tendencies would deprive students, such as Plaintiff WL, of their constitutional rights.

68.     At all times relevant, Defendant Newaygo knew that its policies, procedures, customs, propensity and patterns allowed the individual Defendants to return a student with violent tendencies back to the general school population, without even minimal safeguards, such that their actions created a risk of harm and/or an increased risk of harm to the students of Newaygo Middle School, including Plaintiff WL.

69.     Defendant Newaygo maintained policies and/or failed to implement regulations that allowed individual Defendants to return CC, with his history of violence, back to the general school population, without meaningful consequences or minimal safeguards, such that their actions created a risk of harm and/or an increased risk of harm to the students of Newaygo Middle School, including Plaintiff WL.

70.     These actions and omissions by Defendant Newaygo were the proximate cause of the injuries to Plaintiffs, described herein and below.

*Count IV – Gross Negligence (Defendants Hance, Crater, Gilpin, Smith, McAlister as to Plaintiff WL)*

71.     Defendants were responsible for protecting WL at school from the violent tendencies of CC and other peers, as set forth in the safety plan included in WL's special education plan.

72.     Defendants had sufficient notice of the propensity of CC to violently assault and commit mayhem against WL .

73.     Defendants' failure to act, to prevent CC's subsequent assault of WL, was so reckless that it demonstrated a substantial lack of concern for Plaintiff's safety, security, and well-being, and amounted to gross negligence.

74.     Defendants' gross negligence damaged Plaintiff as described herein and below.

*Count V – Section 504 of the Rehabilitative Act – Discrimination (Defendant Newaygo as to WL)*

75.     WL's medical conditions, described above, qualifies as an actual disability for purposes of Section 504 of the Rehabilitative Act of 1973 in that these conditions substantially limit one or more major life activities. [34 CFR 104.3(j)(1)(i)]

76.     WL qualified for the educational opportunity that he seeks despite the disability.

77.     In spite of these qualifications, WL has not been given an equal opportunity to secure a similar education as other persons, due to the constant fear of assault, the actual assaults and injuries he has suffered, and the retaliation against him.

78.     He was denied those services and educational opportunities solely by reason of his disability.

79.     WL suffers from injuries as a result of his educational deprivations that cannot be addressed by any amount of compensatory education.

80.     Defendant has discriminated against WL in violation of Section 504.

81.     Defendant's discrimination has directly and proximately caused WL great damages as described herein and below.

_Count VI – Part II of the ADA – Discrimination (Defendant Newaygo as to WL)_

82.     WL's medical conditions, described above, qualifies as an actual disability for purposes of the ADA, 42 USC §12102, in that these conditions substantially limit one or more major life activities.

83.     WL qualified for the educational opportunity that he seeks despite the disability.

84.     In spite of these qualifications, WL has not been given an equal opportunity to secure a similar education as other persons, due to the constant fear of assault, the actual assaults and injuries he has suffered, and the retaliation against him.

85.     He was denied those services and educational opportunities solely by reason of her disability.

86.     WL suffers from injuries as a result of his educational deprivations that cannot be addressed by any amount of compensatory education.

87.     Defendant has discriminated against WL in violation of the ADA.

88.     Defendant's discrimination has directly and proximately caused WL great damages as described herein and below.

_Count VII –Persons with Disability Civil Rights Act – PDCRA – Discrimination (Defendant Newaygo as to WL)_

89.     WL's medical conditions, described above, qualifies as an actual disability for purposes of the Michigan Persons with Disability Civil Rights Act (PDCRA) in that these conditions substantially limit one or more major life activities.  [MCL 37.1103]

90.     WL qualified for the educational opportunity that he seeks despite the disability.

91.     In spite of these qualifications, WL has not been given an equal opportunity to secure a similar education as other persons.

92.     Defendant's discrimination has directly and proximately caused WL great damages as described herein and below.

*Count VIII – Section 504 of the Rehabilitative Act – Failure to Accommodate (Defendant Newaygo as to WL)*

93.     Defendant Newaygo was adequately informed of WL's disabilities.

94.     Defendant had the means to accommodate WL's disabilities, and ostensibly did so in their Section 504 "Accommodation Plan" as amended September 21, 2023.

95.     Such accommodations would not have imposed an undue hardship to Defendant.

96.     Defendant failed to reasonably accommodate WL as set forth in the Plan, in violation of Section 504.

97.     Such failure to accommodate has directly and proximately caused WL great damages, as set forth herein and below.

*Count IX – Title II of the ADA – Failure to Accommodate (Defendant Newaygo as to WL)*

98.     Defendant Newaygo was adequately informed of WL's disabilities.

99.     Defendant had the means to accommodate WL's disabilities, and ostensibly did so in their Section 504 "Accommodation Plan" as amended September 21, 2023.

100.    Such accommodations would not have imposed an undue hardship to Defendant.

101.    Defendant failed to reasonably accommodate WL as set forth in the Plan, in violation of the ADA.

102.    Such failure to accommodate has directly and proximately caused WL great damages, as set forth herein and below.

*Count X – Persons with Disability Civil Rights Act – PDCRA – Failure to Accommodate (Defendant Newaygo as to WL)*

103.    Defendant was adequately informed of WL's disabilities.

104.    Defendant had the means to accommodate WL's disabilities, and ostensibly did so in their Section 504 "Accommodation Plan" as amended September 21, 2023.

105.    Such accommodations would not have imposed an undue hardship to Defendant.

106.    Defendant failed to reasonably accommodate WL as set forth in the Plan.

107.    Such failure to accommodate has directly and proximately caused WL great damages, as set forth herein and below.

*Count XI – Section 504 of the Rehabilitative Act – Retaliation (Defendant Newaygo as to both Plaintiffs)*

108.    Plaintiff Robert Lemson spoke out against Defendants' discrimination as to WL in multiple email messages, visits to the school, and at school board meetings.

109.    This was protected activity under Section 504 [29 U.S.C. § 794(a) and 29 C.F.R. § 33.13], and it was known to Defendant Newaygo.

110.    In response, Defendant Newaygo retaliated by silencing him at meetings (Grodus), enforcing a trespass ban against him (Gilpin), investigating his son WL for non-existent threats and subjecting him to suspension, singular scrutiny, and intrusive searches (Smith and McAlister), and calling police on him for rescuing Defendant Hug's cows (Hug).

111.    This retaliation was because of Robert Lemson's protected activity.

112.    These actions violated the anti-retaliation provisions of Section 504, and damaged both Plaintiffs as alleged herein and below.

*Count XII – ADA – Retaliation (Defendant Newaygo as to both Plaintiffs)*

113.    Plaintiff Robert Lemson spoke out against Defendants' discrimination as to WL in multiple email messages, visits to the school, and at school board meetings.

114.    This was protected activity under the ADA [42 U.S.C. § 12203 and 28 C.F.R. 35.134], and it was known to Defendant Newaygo.

115.    In response, Defendant Newaygo retaliated by silencing him at meetings (Grodus), enforcing a trespass ban against him (Gilpin), investigating his son WL for non-existent threats and subjecting him to suspension, singular scrutiny, and intrusive searches (Smith and McAlister), and calling police on him for rescuing Defendant Hug's cows (Hug).

116.    This retaliation was because of Robert Lemson's protected activity.

117.    These actions violated the anti-retaliation provisions of Section 504, and damaged both Plaintiffs as alleged herein and below.

*Count X – Persons with Disability Civil Rights Act – PDCRA – Retaliation (Defendants Gilpin, Smith, McAlister, Grodus, and Hug as to both Plaintiffs)*

118.    Plaintiff Robert Lemson spoke out against Defendants' discrimination as to WL in multiple email messages, visits to the school, and at school board meetings.

119.    This was protected activity under the PWDCRA [MCL § 37. 1602], and it was known to Defendants

120.     In response, Defendant Newaygo retaliated by silencing him at meetings (Grodus), enforcing a trespass ban against him (Gilpin), investigating his son WL for non-existent threats and subjecting him to suspension, singular scrutiny, and intrusive searches (Smith and McAlister), and calling police on him for rescuing Defendant Hug's cows (Hug).

121.     This retaliation was because of Robert Lemson's protected activity.

122.     These actions violated the anti-retaliation provisions of the PWDCRA, and damaged both Plaintiffs as alleged herein and below.

*Count XI – First Amendment Retaliation (Defendants Gilpin, Smith, McAlister, Grodus, and Hug as to both Plaintiffs)*

123.     Plaintiff Robert Lemson exercised his First Amendment right, regarding a matter of public concern relating to bullying and protection of students, among other things, as described above, when he addressed the Newaygo School Board on February 5, 2024, and wrote multiple emails to the Superintendent and Middle School principals.

124.     Plaintiff's protected speech caused neither a material nor substantial disruption to the District.

125.     In response, Defendant Newaygo retaliated by silencing him at meetings (Grodus), enforcing a trespass ban against him (Gilpin), investigating his son WL for non-existent threats and subjecting him to suspension, singular scrutiny, and intrusive searches (Smith and McAlister), and calling police on him for rescuing Defendant Hug's cows (Hug).

126.     This retaliation against Plaintiffs violated their rights to be free from punishment or retaliation for Robert Lemson's exercise of First Amendment rights, under the 14th Amendment to the U.S. Constitution, codified by 42 U.S.C. § 1983.

127.    At all times relevant, Mr. Lemson had a clearly established right to freedom of speech of which a reasonable public official would have known.

128.    Because the above-named individual Defendants violated constitutional rights about which a reasonable public official should have known about, they are not entitled to governmental immunity in either their official or individual capacities.

129.    These Defendants, by their conduct, showed intentional, outrageous, and reckless disregard for Plaintiffs' First Amendment rights, and acted out of vindictiveness, malice and ill will towards Plaintiff Robert Lemson and his son, WL, with bias and animus, with intent to punish Plaintiffs for Robert's exercise of rights, and to chill or deter him from exercising those rights.

### Damages

130.    As a proximate cause and/or a consequence of Defendants' conduct and actions, Plaintiffs suffered actual and/or consequential damages as follows: as to WL, severe physical injuries and pain and anguish, and as to both Plaintiffs, emotional distress and/or loss of hedonic value of life, public humiliation, embarrassment and outrage, mental anguish, anxiety and mortification, depression, disappointment, and physical manifestations including sleeplessness, loss of appetite and listlessness.

131.    Defendants' actions were made with reckless disregard to Plaintiffs' legal and civil rights and warrant imposition of the greatest possible combination of punitive, emotional distress and exemplary damages, as allowed by law.

### Jury Demand

Plaintiffs demand a jury trial.

### Relief Requested

Plaintiffs request this honorable court grant them the following relief:

a.      damages as warranted by the proofs;

b.      costs, pre- and post-judgment interest and attorney fees;

c.      any other relief as is just and allowed by law, including but not limited to equitable, injunctive and declaratory relief.

Respectfully submitted,

Attorneys for plaintiff

**ROUMEL LAW**

*s/Nicholas Roumel*

Nicholas Roumel, Attorney
4101 Thornoaks Dr.
Ann Arbor MI 48104
(734) 645-7507
*nick@roumel-law.com*

March 25, 2024

- 20 -